UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Kaiser Faisal Nur, | Case No. 19-cv-2384 (WMW/DTS) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Elizabeth Sanders, *in her individual and official capacity;* and | |
| Olmsted County, | |
| Defendants. | |

---

William French, William L. French Attorney at Law, 627 Woodhaven Court N.E., Rochester, MN 55906, for Plaintiff

Gregory Griffiths, Dunlap & Seeger, P.O. Box 549, Rochester, MN 55903, for Defendants

---

## INTRODUCTION

Kaiser Faisal Nur alleges that Detention Deputy Elizabeth Sanders used excessive force when she tased him at the Olmsted County Adult Detention Center (ADC). One of the taser probes struck him in the head, causing him to suffer a seizure. Nur also alleges that, before the tasing incident, Olmsted County was deliberately indifferent to his serious medical needs because the ADC had repeatedly denied his requests to provide him his seizure medication; and because after the tasing the ADC failed to take him back to the Mayo Clinic for follow-up care as stated in his hospital discharge instructions.

Defendants move for summary judgment on both claims. The Court concludes that Sanders' use of the taser was reasonable as a matter of law and recommends that

summary judgment be granted on Nur's excessive force claim. As to Nur's deliberate indifference claim, Olmsted County contends his allegations amount to nothing more than a disagreement over medical treatment which does not rise to the level of an Eighth Amendment violation. Nur responds that he is unable to present facts essential to support his opposition to summary judgment and asks that consideration of the motion be deferred pursuant to Federal Rule of Civil Procedure 56(d) so that additional discovery can be done. The Court recommends granting Nur's request and denying the summary judgment motion without prejudice pending further development of the record.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the lawsuit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* In assessing whether a genuine dispute exists, the Court views the evidence in the light most favorable to the non-moving party and affords him all reasonable inferences. *Rooney v. Rock-Tenn Converting Co.*, 878 F.3d 1111, 1115 (8th Cir. 2018).

The moving party bears the initial responsibility of identifying the basis for its motion and the portions of the record that it believes demonstrate the absence of a genuine dispute of material fact. *Bedford v. Doe,* 880 F.3d 993, 996 (8th Cir. 2018). Once the moving party satisfies the initial burden, the nonmoving party must respond by submitting evidentiary materials of specific facts showing the presence of a genuine

issue for trial. *Id.* at 997. The nonmoving party must do more than raise some metaphysical doubt about the material facts and cannot rest on mere denials or allegations. *Id.* Rather, the nonmovant must present enough evidence so that a jury could reasonably find in his favor. *Id.*

When video has captured the events, the Court should view facts in the light depicted by the video when it establishes there is no genuine issue of material fact. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); *Wallingford v. Olson*, 592 F.3d 888, 892 (8th Cir. 2010) (same). If video footage is inconclusive, however, the Court follows the usual summary judgment standard of viewing facts and all reasonable inferences in favor of the nonmoving party. *See McManemy v. Tierney*, 970 F.3d 1034, 1037, 1039 (8th Cir. 2020) (rejecting deputies' argument that dash-cam video rebutted plaintiff's claim he was repeatedly bashed in the head with a knee, finding the video was "too grainy" and "equivocal at best"); *Edwards v. Byrd,* 750 F.3d 728, 733 (8th Cir. 2014) (rejecting security officers' argument that detention center video disproved detainees' account of the incident because the video did not show the interior of the housing area where the conduct at issue occurred).

## EXCESSIVE FORCE CLAIM - TASING INCIDENT

**I.    Findings of Fact**

The Court presents the facts in the light most favorable to Nur, the nonmoving party, but also in light of the video evidence when appropriate.

Olmsted County operates the Olmsted County Adult Detention Center (ADC). Elizabeth Sanders is a Detention Deputy at the ADC. Nur was a pretrial detainee when Sanders tased him on October 15, 2017 in the day room of Housing Unit 1801. Defendants submitted a DVD with five video recordings, two of which capture the incident: the day room video (ADC 1801-2), and Sanders' bodycam (Axon) video.[1] Howard Aff. ¶¶ 3-4 & Ex. A (DVD), Docket Nos. 32, 32-1. The ADC video does not include audio. The bodycam does not include audio until after Nur has been tased.

Just before the tasing incident, Sanders was at her post behind a desk near a wall in the day room. ADC 1801-2 at 9:02:23 PM; Axon 00:00. There are approximately 21 detainees in the day room; a few individuals walk in and out of camera range during the time period at issue. Nur is standing in the foreground of the video frame between two tables where several people are seated. He is standing in the narrow aisle of space between two rows of tables. 9:02:23. The victim[2] comes into camera view and walks toward the desk and appears to say something to Sanders. The victim's head is turned to the left, away from Nur and toward the desk. 9:02:38-:40. Then the victim walks down the aisle between the tables, passing behind Nur, who turns his head to look at the victim as the victim walks away. 9:02:41-:42. When the victim is a couple of tables

---

[1] A second day room video recording, ADC 1801-1, is from a security camera at the opposite end of the room and does not capture the tasing incident or Nur's actions immediately beforehand. Two other video recordings show the ADC garage exit, where Nur was taken on a gurney and put in an ambulance to be transported to the hospital, and no events shown on those recordings are at issue in the present motion.

[2] There is no dispute the other detainee was the "victim" of Nur's punches during this incident. Although Nur contends the victim had threatened him earlier, the video in the record that begins approximately 40 seconds before Nur's first punch shows no interaction between them, and they are not in the same part of the day room until Nur punches him. Whether or not Nur was provoked does not affect the Court's analysis of Sanders' use of the taser here.

4

away, Nur starts to walk slowly behind him. 9:02:45. As the victim heads toward, and eventually enters, a room at the far end of the camera frame, Nur stops in the aisle near the far end of the two rows of tables. 9:02:53. Most of the tables at this end are unoccupied. Between Nur and Sanders at the desk, there are two tables and seven chairs. Two detainees are seated at one of the tables; another detainee is sitting in a chair along the wall.

Nur continues to stand in the aisle and he looks to his right, toward the part of the room where most of the detainees are located. 9:02:54. His face is toward the camera. *Id.* Nur is positioned so that, if anyone walks down the narrow aisle between the tables, the person would have to walk in front of, not behind, him. Nur continues to stand in place, with his body angled slightly to the right, and adjusts his head so it is slightly to his right. 9:02:56. The victim emerges from the room at the far end of the hall and starts walking back toward the area with the tables. 9:03:00. Nur turns his head slightly further to his right as a detainee approaches the desk from the foreground of the video frame, then turns it back again. 9:03:03.

The victim is now approaching Nur as he walks down the aisle. 9:03:05. Nur is standing in place. *Id.* Nur continues to stand still but turns his head slightly to the left as the victim is almost even with him. 9:03:07. Nur then swivels and launches his right arm to hit the victim in the head. *Id.* The victim is knocked backwards. 9:03:08. Nur raises his right arm again, elbow bent, and hits him again in the head. The victim falls backwards toward an empty table. *Id.* The back of the victim's head appears to hit the edge of the table, and he falls to the floor at the base of the table. 9:03:09. The impact causes the table to move back. *Id.*

5

Sanders starts to leave the desk, moving to her left, between the wall and a row of tables. 9:03:09; Axon 00:25. There is a detainee in front of her, who moves to the right to get out of her way as she moves forward. *Id.* She continues forward; to her right there is still one table and two detainees between her and Nur. 9:03:10; Axon 00:26-:27.

Nur is bent over at the waist, knees bent, right arm extended toward the victim's head, and punches him a third time. 9:03:09. Nur raises his back up slightly but is still bent over the victim with his right arm near the victim's head. 9:03:10. Nur then crouches lower and extends his right arm again toward the victim's head and hits him a fourth time. *Id.* The victim has raised his arm to try to protect his head. *Id.* He is mostly on his back on the floor, crumpled up next to the table base, with his head and shoulders slightly raised off the floor against the table base. *Id.*

Sanders continues to move forward, and the two seated detainees get out of their chairs and move to the right, away from Nur and the victim. 9:03:011; Axon 00:26-:27. Nur stands up. 9:03:11; Axon 00:28. His back is mostly straight but his head and upper shoulders are bent over toward the victim. *Id.* His right arm is down but is away from his body, not at his side. *Id.* Sanders' right arm is extended and holds the taser. *Id.* She is about 10-12 feet from Nur. Sanders Depo. Tr. 12, Docket No. 33-2. Nur starts to bend over further at the waist, with his arm reaching down. 9:03:11; Axon 00:28. The red dot of the taser's laser sight can be seen on Nur's lower right back/side. 9:03:11-12; Axon 00:28-:29. It is red-orange in the bodycam video, but appears as a white glowing spot in the day room video, which is taken from much farther away. *Id.* Sanders discharges the taser, and Nur jerks and falls straight backwards onto the floor on his back. 9:03:12; Axon 00:28-:29.

6

Thereafter, all the detainees leave the day room, including the victim, and Nur begins to have a seizure. 9:03:23-:48. Other deputies and first responders arrive to attend to Nur, and he was taken to the emergency room at St. Mary's Hospital. *See* Incident Reports, Howard Aff. Ex. C, Docket No. 32-3. The taser probes hit Nur's right arm and the right side of his head. Sanders Depo. 11-12, Docket No. 33-2. When additional deputies responded, the taser probes were still attached to Nur's body and one probe was lodged in the side of his head. Ex. C., Docket No. 32-3 at 3. The probe in Nur's head was surgically removed at the hospital. Nur Depo. Tr. 16-17, Docket No. 44-1. Nur's victim was taken to the ADC's medical department to be evaluated and have the abrasion on the back of his head properly cleaned. Ex. C, Docket No. 32-3 at 3.

Nur testified he heard Sanders say "stop fighting" and contends he did stop and was "standing all the way up" and no longer fighting when Sanders discharged the taser without warning. Nur Depo. Tr. 13, Docket No. 44-1; Compl. ¶ 11, Docket No. 1. Sanders' incident report states that she had just finished talking to a detainee at her post behind the desk when she looked up and saw Nur strike the victim in the face with his right hand, causing the victim to fall to the ground. Sanders Narrative Rpt., Docket No. 32-3 at 5. She yelled for them to stop fighting, but Nur continued to strike the victim on the ground and ignored her order to stop. *Id.* She then approached and deployed her taser. *Id.*

Sanders testified the optimum range for a taser is 10-12 feet and that taser probes widen out over distance. Sanders Depo. Tr. 7, 12, Docket No. 33-2. Policy states that a taser should be aimed at a person's midsection. *Id.* at 12; Howard Depo. Tr. 12, 25, Docket No. 33-1. A person aims a taser like a gun, and the taser projects a

7

red dot that functions as an aiming dot. Howard Depo. Tr. 25, Docket No. 33-1. Sanders testified she aimed for the center of Nur's back but he was moving and twisting, his arm was coming up in a punching motion, and the taser probes hit him in his right arm and the right side of his head. Sanders Depo. Tr. 11, Docket No. 33-2; Sanders Narrative Rpt., Docket No. 32-3 at 5.

## II.   Conclusions of Law

The Due Process Clause of the Fourteenth Amendment protects a pretrial detainee from the use of excessive force. *Kingsley v. Hendrickson*, 576 U.S. 389, 397-98, 400 (2015). The detainee must show that the force purposely or knowingly used against him was objectively unreasonable. *Id.* at 396-97. Objective reasonableness turns on the facts and circumstances of each particular case and is viewed from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with hindsight. *Id.* at 397. A court must also account for the legitimate interests that stem from the need to manage the detention facility, giving appropriate deference to practices needed to preserve internal order and discipline and to maintain institutional security. *Id.* Among the considerations that may be "potentially relevant to a determination of excessive force" are the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting. *Id.*

Nur argues Sanders' use of the taser was not objectively reasonable because a probe landed on his head. He contends she should have either not used the taser at all,

because he had stopped fighting, was standing upright and away from the victim who was on the floor; or she should have moved closer before tasing him to reduce the chance of an errant probe, because "nothing was preventing her from moving closer to Nur before deploying her Taser." Pl. Br. 6-7, Docket No. 43.

The Court has watched the bodycam and ADC 1801-2 day room videos several times, both at real-time speed and frame by frame. Although the Court views the facts and any reasonable inferences in the light most favorable to Nur, the video footage shows that Nur did not retreat or move away from the victim so that he would not be able to inflict further harm. In addition, Nur's back was somewhat bent, not fully upright. He had just punched the victim four times in the head in the span of about four seconds (ADC 1801-2 at 9:03:07-:10), knocking him to the ground and causing his head to hit the tabletop, and Sanders tased Nur one-to-two seconds after that (*Id.* at 9:03:11-:12) after yelling at him to stop fighting. Sanders was the only officer in the day room where well over a dozen detainees were present.

Furthermore, Nur is incorrect in stating there was nothing between Sanders and him, so that she should and easily could have moved closer before tasing him. When Nur threw the first punch and Sanders looked over at him, she was at the desk and there was no direct path from her to Nur. There were tables, several chairs, and several detainees in between them. She walked to her left along the wall side of the row of tables. After she had passed the table where two detainees had been seated and she was clear of the last person between her and Nur, she raised her arm holding the taser as she moved toward him. Only then was there nothing left between Sanders and Nur, and by that point he had already punched the victim multiple times within a few seconds

9

and was positioned so that he could do so again. The red-orange dot from the taser projected onto Nur's lower back and she discharged the taser.

From Sanders' perspective, it was reasonable to believe that Nur would and could continue to punch the victim or pose another threat, regardless of whether Nur subjectively was done fighting and intended to stop. No such intent is manifested in the video, even when freeze-framing the footage, much less in real time as experienced by Sanders. *See Kingsley*, 576 U.S. at 399 ("Officers facing disturbances are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving.") (internal quotation marks and citation omitted). The unfortunate fact that Nur suffered a serious medical outcome does not change the analysis here in light of all the specific facts and circumstances of the tasing. The Court concludes Sanders' use of the taser was reasonable as a matter of law and recommends summary judgment be granted on the excessive force claim.[3]

Nur also sued Sanders in her official capacity, but his complaint contains no allegations against Olmsted County. In fact, he alleged her use of the taser violated the ADC's policies and procedures. Compl. ¶ 16, Docket No. 1. The Court likewise recommends dismissal of the official capacity claim.

**DELIBERATE INDIFFERENCE CLAIM - REQUESTS FOR SEIZURE MEDICATION**

**I.     Findings of Fact**

Nur suffers from epilepsy as a result of a gunshot to the right side of his head. Compl. ¶ 9, Docket No. 1. He has been taking seizure medication since 2013. Nur

---

[3] Because of the Court's recommended disposition, it need not address Sanders' additional argument that she is entitled to summary judgment based on qualified immunity.

Depo. Tr. 6, Docket No. 44-1. It was prescribed by physicians at the Mayo Clinic in Rochester, Minnesota. Compl. ¶ 9, Docket No. 1. He took the medication while detained at other facilities before arriving at the Olmsted County ADC but the ADC refused to provide him with such medication until after he was tased and suffered a seizure. Nur Depo. Tr. 7-8, Docket No. 44-1.

Nur was booked into the ADC on May 7, 2017. Howard Aff. Ex. B (Booking Card), Docket No. 32-2 at 1. The electronic booking questionnaire says "no" next to the question "Are you taking any medications?" but Nur testified he did not recall saying that. *Id.* (Questionnaire), Docket No. 32-2 at 3; Nur Depo. Tr. 22, Docket No. 44-1. The questionnaire says "yes" next to the question about seizures, along with the comment "seizures, last one was 4-5 months ago." Ex. B, Docket No. 32-2 at 7. Nur also testified he did not recall this question and answer, as the booking occurred over three years before his deposition in July 2020, but he recalled telling the questioner that he had seizures. Nur Depo. Tr. 22-23, Docket No. 44-1. The word "no" appears next to questions asking whether Nur had a "regular doctor" or "any current illnesses or health issues"; Nur testified he does not have a regular doctor, and that when asked whether he had any medical problems he responded that he had seizures. Ex. B, Docket No. 32-2 at 3; Nur Depo. Tr. 22, Docket No. 44-1. Next to the question "When was the last time you were seen by a doctor or medical professional?" the questionnaire says "Yes, list when and what for" and then "Comments: long time ago." Ex. B, Docket No. 32-2 at 3. At his deposition Nur did not recall that response. Nur Depo. Tr. 22, Docket No. 44-1.

Neither the one-page Booking Card nor the 11-page questionnaire[4] shows any signature by Nur, although several of the pages include "inmate" signature lines. The Booking Card has a handwritten "Reviewed By" signature dated May 8, 2017 by someone identified as an "RN." Ex. B, Docket No. 32-2 at 1. The handwritten word "seizures" appears at the top of the Booking Card directly under Nur's name. *Id.*

On May 17, 2017, 10 days after being booked into the ADC, Nur sent an email with the subject line "Medical Issue" stating:

Can u order my siezure medication please. Thanks. Kaisar nur

Howard Depo. Ex. 1, Docket No. 33-1. On May 18, 2017 Nur received the following reply from an unnamed person at "adcmedical":

you have not had seizure meds since october 2016. Provider will review.

*Id.*

On September 23, 2017 Nur sent a second email asking:

When are u guys gonna start me on my seizuer meds

*Id.* Ex. 2. Having received no reply by the following day, Nur sent a third email at 3:16 PM on September 24, 2017 with the same question:

When are u guys gonna start me on my sizuer meds

*Id.* Ex. 3.

"adcmedical" then replied twice in succession on September 24, 2017. ADC's first reply, at 4:13 PM, stated:

duplicate message

*Id.* Ex. 2. ADC's second reply, at 4:15 PM, stated:

---

[4] The questionnaire includes several other topics in addition to medical questions.

12

> You have not needed these here and our provider is choosing not to start them. This has been addressed on May 18, 2017.
> medical

*Id.* Ex. 3.

On September 27, 2017 Nur sent a fourth email requesting his medication:

> I keep on alerting your department of my request for my seizure medication, i am continuously receiving replies of denial for it. My purpose of requesting for my seizure medication is because my body is telling me i need it through symptoms im feeling.. Im continuously being refused and i don't know why or for what reasons why…

*Id.* Ex. 4. Two days later, on September 29, 2017, adcmedical replied:

> The provider has reviewed your chart and determined that there is no need for seizure medications at this time. If you would like, medical can discuss your symptoms and possibly address those espacifically (sic).

*Id.*

None of the emails from "adcmedical" identified the name or position of the person replying to Nur's emails. The ADC's emails also did not identify the "provider" referred to in the three email replies who purportedly determined—contrary to his Mayo physician—that Nur did not need his seizure medication.

Nur had a seizure after he was tased on October 15, 2017. He was taken to the emergency room at St. Mary's Hospital. Compl. ¶ 11, Docket No. 1. An ER physician asked whether he was taking his seizure medication, and Nur replied that ADC would not allow him to take any medication. *Id.* ¶ 12; Nur Depo. Tr. 16, Docket No. 44-1. The physician told him he needed to return to the hospital for a follow-up, and this information was included in his discharge summary, but the ADC never took him back for a follow-up visit. Compl. ¶ 13, Docket No. 1; Nur Depo. Tr. 24, Docket No. 44-1. The Mayo Rochester Discharge Instructions dated October 16, 2017 include Special

Instructions that provide a name and phone number to call the following day or later "to arrange epilepsy clinic follow-up . . . to ensure the best anti-epileptic regimen is being utilized." Docket No. 32-2 at 13-14. After Nur returned to the ADC he was given seizure medication that he took every day. Nur Depo. Tr. 17, 23-24, Docket No. 44-1.

## II. Conclusions of Law

The Court applies the Eighth Amendment's "deliberate indifference" standard to a pretrial detainee's claim that a defendant's failure to provide medical care was unconstitutional. *Barton v. Taber*, 820 F.3d 958, 964 (8th Cir. 2016). Such failure is unconstitutional when the plaintiff has an objectively serious medical need and the defendant knew of, but disregarded, that need. *Id.* An objectively serious medical need is evidenced through a doctor's diagnosis or must be obvious to a layperson based on the attendant circumstances. *Id.* at 964-65. To demonstrate the defendant's disregard requires more than negligence or even gross negligence, but such a mental state can be inferred from facts that show the response to the medical need was "obviously inadequate." *Id.* at 965. Mere disagreement with treatment decisions is insufficient as a matter of law to constitute deliberate indifference to medical needs in violation of the Eighth Amendment. *See Jones v. Minnesota Dep't of Corrections,* 512 F.3d 478, 482 (8th Cir. 2008).

Nur claims that Olmsted County was deliberately indifferent to his medical needs by denying his repeated requests for his seizure medication during the time period before he was tased, and by failing to take him back to the Mayo Clinic for ordered follow-up care after being hospitalized for the seizure caused by the tasing. Pl. Br. 9,

14

Docket No. 43. He alleges the county has a custom or practice of not providing medical treatment. *Id.*; Compl. ¶ 18, Docket No. 1.

Nur also asserts he is unable to present facts essential to support his opposition to summary judgment on this claim and asks that consideration of the motion be deferred pursuant to Federal Rule of Civil Procedure 56(d) so that additional discovery can be done. He cited (in his brief, at the hearing, and in a declaration) financial considerations as well as counsel's personal risk factors relating to the COVID-19 pandemic and the risks and uncertainty of taking depositions earlier in 2020. Pl. Br. 9, Docket No. 43; French Decl., Docket No. 44.

Rule 56(d) states:

> **When Facts Are Unavailable to the Nonmovant**. If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
> (1)   defer considering the motion or deny it;
> (2)   allow time to obtain affidavits or declarations or to take discovery; or
> (3)   issue any other appropriate order.

Nur has not sued any individual medical provider, and he pleaded his claim against Olmsted County in a conclusory fashion. But, as discussed at the September 16, 2020 hearing, the Court is troubled by the undeveloped record and the absence of any specific evidence that any medical professional, much less a qualified physician, made the decision to deny Nur the requested seizure medication.

Olmsted County asserts that Nur's claim reflects a mere disagreement over treatment which is not a cognizable constitutional claim. It relies on the May 7, 2017 ADC booking questionnaire stating he was not taking any medications and last saw a doctor a "long time ago." Def. Br. 10, Def. Reply Br. 4, Docket Nos. 34, 46. But Olmsted

15

County offers no explanation of why the abbreviated answers to those two questions on the booking questionnaire are persuasive, much less dispositive, given that the same questionnaire clearly indicates Nur has had seizures, the Booking Card signed by an RN has the word "seizures" written at the top under his name, and 10 days later Nur sent the first of four emails specifically asking for his seizure medication.

Moreover, "adcmedical"'s replies to his emails do not on their face refer to or rely on the booking questionnaire; rather, they represent that a "provider" has "reviewed [Nur's] chart" and made a medical determination that he had "no need for seizure medications at this time." There is nothing in the record to identify who made this determination, or when, or on what medical basis, or the qualifications of the person making the decision. *Cf., e.g., White v. Vanderbeek,* No. 18-cv-3424, 2020 WL 2857542, at *1 n.1 (D. Minn. Apr. 24, 2020) (defendant provided 170 pages of medical records documenting disagreement over requested medication to support summary judgment motion, while plaintiff submitted nothing in opposition), *report and recommendation adopted*, 2020 WL 2850165 (June 2, 2020). Furthermore, while Olmsted County's summary judgment theory is that Nur raised a mere disagreement about treatment, it submitted no "treatment" records or any medical evaluations (other than the booking questionnaire), just the perfunctory unsigned email replies denying Nur's requests for his seizure medication.

Consequently, the Court is not fully persuaded that Olmsted County has satisfied its initial summary judgment burden to identify portions of the record that demonstrate the absence of a genuine dispute of material fact. *See Bedford*, 880 F.3d at 996; Rule 56 Advisory Cmte. Notes to 1963 Am. ("Where the evidentiary matter in support of the

motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented. And summary judgment may be inappropriate where the party opposing it shows under subdivision [(d)][5] that he cannot at the time present facts essential to justify his opposition."). More fundamentally, though, the Court finds that further development of the record, properly limited in scope, is appropriate and serves the interests of justice in this case. The Court believes this can be accomplished reasonably expeditiously between the parties, with appropriate modifications of the scheduling order and preserving defendant's rights to file another summary judgment motion, as set forth in the recommendation below. Therefore, the Court recommends granting Nur's Rule 56(d) request and denying without prejudice Olmsted County's summary judgment motion on the deliberate indifference claim pending further development of the record.

## RECOMMENDATION

For the reasons set forth above, the Court RECOMMENDS THAT Defendants' Motion for Summary Judgment [Docket No. 30] be GRANTED IN PART and DENIED IN PART as follows:

1. That summary judgment be granted on the excessive force claim and it be dismissed with prejudice;

2. That Deputy Elizabeth Sanders be dismissed from this lawsuit;

3. That summary judgment be denied without prejudice on the deliberate indifference claim, pending further development of the record as follows:

---

[5] The committee note cites to former subdivision (f) which is now subdivision (d) pursuant to the 2010 Amendment.

17

(a) The parties be allowed 90 days from the date of the Court's Order on the Report and Recommendation to complete written discovery and depositions that are limited in scope to the deliberate indifference claim alleged in the complaint;

(b) Plaintiff Nur be allowed to amend his complaint to add appropriate party(ies) as defendant(s) to his deliberate indifference claim no later than 10 days after the close of this additional discovery period.

(c) Defendant Olmsted County and/or any new defendant be allowed to bring a summary judgment motion on the deliberate indifference claim.

(d) The scheduling order be amended so that the summary judgment deadline is served, filed, and scheduled no later than 60 days after Nur amends his complaint

(e) The parties will be ready for trial no later than 4 months after a ruling on any summary judgment motion scheduled in (d) or 4 months after the deadline in (d) if no summary judgment motion is filed.

Dated: October 9, 2020    s/David T. Schultz  
                                               DAVID T. SCHULTZ  
                                               U.S. Magistrate Judge

## **NOTICE**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those

objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).