## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Kaiser[1] Faisal Nur,

     Plaintiff,

v.

Olmsted County; Stella Eissen,[2]
*in her individual and official capacity*;
Elizabeth Schneider-Loberg,
*in her individual and official capacity*; and
MEnD Correctional Care, PLLP,[3]

     Defendants.

Case No. 19-cv-2384 (WMW/DTS)

**REPORT AND RECOMMENDATION**

## INTRODUCTION

Plaintiff Kaisar Faisal Nur alleges Defendants were deliberately indifferent to his serious medical needs by withholding his anti-seizure medication. He further alleges Olmsted County and MEnD Correctional Care had a policy or practice that facilitated such deliberate indifference. Defendants have moved for summary judgment arguing that Nur cannot establish he had a serious medical need nor their deliberate indifference to it. Olmsted County and MEnD seek summary judgment on Nur's putative *Monell* claim, arguing he has failed to plead such a claim or provide any evidence to support it. For the

---

[1]  Kaisar Nur testified his name is "Kaisar," though his Amended Complaint incorrectly says "Kaiser." Nur Dep. Tr. 4, Dkt. No. 44-1.

[2]  Stella Essien testified her name is "Essien" but it appears everywhere in this lawsuit (other than her signature on records) as Eissen, including the caption, Defendants' joint answer, summary judgment motion, and briefs. Essien Dep. Tr. 2, Dkt. No. 61-1.

[3]  The caption incorrectly identifies MEnD as a "PLLP" rather than "PLLC." *See* MEnD Defendants' Answer at 1, Docket No. 56.

reasons set forth below the Court recommends denying summary judgment on the deliberate indifference claim but granting it on the *Monell* claim.

## FINDINGS OF FACT

### I.      Nur's Claims and the Parties

Nur has sued Stella Essien, a nurse practitioner (NP), Elizabeth Schneider-Loberg, a registered nurse, and their employer, MEnD Correctional Care, PLLC under 42 U.S. C. § 1983 claiming they violated his Eighth and Fourteenth Amendment rights by failing to provide adequate medical care in deliberate indifference to his serious medical needs. Specifically, he alleges they failed to give him anti-seizure medication while he was detained at the Olmsted County Adult Detention Center (ADC).

As to Olmsted County, Nur alleges the County is "responsible for the policies, procedures and practices implemented by its independent contractors" and "had final judgment on all medical matters related to healthcare of detainees." Am. Compl. ¶ 6, Dkt. No. 50. Nur also alleges that "Olmsted has a practice and custom of failing to provide adequate medical care and treatment as exemplified in *Phillip Schaub v. Steven VonWald*, 638 F.3d 905 (2011)," which "continues to the present day. . . ." *Id.* ¶ 28. No explicit *Monell* claim is alleged in Nur's Amended Complaint.

### II.     State of the Record

This case comes to the Court on a motion for summary judgment in a somewhat unusual posture. The case concerns the failure to provide Nur's anti-seizure medication. It is undisputed that Nur requested his medication on several occasions while detained at the Olmsted County ADC; he did not have such medication in his possession when he arrived at the ADC; he was not given any anti-seizure medication while at the ADC in

response to his requests; that on October 15, 2017, after being tased in the ADC, Nur suffered a seizure; and he went to the Mayo Clinic where they removed the taser barbs and "load[ed him] with Dilantin"[4] and "prescribe[d] a short 1 week course of Dilantin for him so that his prison physicians can continue this." Dkt. No. 62 at 28. The Mayo Emergency Department also arranged for Nur to receive follow-up care in Mayo's epilepsy clinic. Beyond these undisputed facts the record is opaque.

The individual defendants, Stella Essien and Elizabeth Schneider-Loberg, have provided no evidence about the decision to withhold anti-seizure medication from Nur. Schneider-Loberg was not deposed and has filed no affidavits. Essien was deposed but has no present recollection of any of the events related to Nur and his request for his medication. Essien Dep. Tr. 3- 4, 6-7, 10-11, 14-15, Dkt. No. 61-1. For his part, Nur was deposed but has provided no affidavit to the Court. Accordingly, many of the critical facts of this case (and the basis for summary judgment) are entirely dependent upon the contemporaneous written record.

## III.   Sequence of Events

According to the Olmsted County Sheriff's Office Booking Card, Nur was booked into the Olmsted County ADC at 7:19 p.m. on May 7, 2017. Dkt. No. 32-2 at 1. The Booking Card indicates it was reviewed and signed by a registered nurse who dated the form "5/8/17 07:29." *Id.* The nurse's name is not legible. At the top of the Booking Card is a handwritten notation "seizures." *Id.* No other information is provided to this Court about the Booking Card except that it is portrayed as a Record of a Regularly Conducted Activity

---

[4] The records in this lawsuit sometimes refer to Dilantin and sometimes to its generic equivalent Phenytoin.

within the meaning of Federal Rule of Evidence 803(6). Aff. of Brian Howard ¶ 5, Dkt. No. 32.

The Court has also been provided a document titled Completed Questionnaire that was "completed by Plaintiff" at the time of booking. *Id*. It is a typed form that contains signature and date lines for the intake officer and the inmate. Dkt. 32-2 at 2-12. The Completed Questionnaire is not signed or dated by either the officer or Nur. *Id*. It is readily apparent from the face of the form that the detainee provides verbal answers to the officer who then inputs the information into the form via computer.[5] According to the Booking Medical Questions portion of the Completed Questionnaire (which was printed at 9:56 p.m. on May 7, 2017) Nur had no regular doctor, no "current illnesses or health issues," and was not "taking any medications." Dkt. No. 32-2 at 3. The form also states that Nur was last seen by a doctor "long time ago." *Id*. No other information has been provided to the Court regarding the Completed Questionnaire. Nur denies that the form accurately recorded his answers to these questions. Nur Dep. Tr. 22-23, Dkt. No. 44-1. Another part of the form records that he last had a seizure four or five months previously (*i.e.,* approximately December 2016 or January 2017). Dkt. No. 32-2 at 7.

On May 12, 2017, five days after being booked into the ADC, Nur was transferred to Dakota County. *See* MEnD Medical Inmate Transfer Form, Dkt. No. 62 at 40. The document does not state the reason for transfer, but Nur's Amended Complaint says he was sent to Dakota County to make a court appearance. Am. Compl. ¶ 19, Dkt. No. 50.

---

[5] Chief Deputy Howard's affidavit does not address the manner in which Completed Questionnaires are filled out, *i.e.,* whether by interview and, if so, conducted by whom. He also does not represent that Completed Questionnaires are created in the regular course of the ADC's business. Howard Aff. ¶ 5, Dkt. No. 32.

Nur apparently was transferred back to the ADC five days later. The record does not show a return transfer form, but Nurse Schneider-Loberg's handwritten note (discussed below) indicates he was at the Dakota County Jail from May 12 through May 16. Dkt. No. 62 at 78.

On May 17, 2017, ten days after arriving at the Olmsted County ADC and one day after returning from the Dakota County Jail, Nur sent a kite to the ADC medical provider that stated, "Can u order my siezure medication please. Thanks. Kaisar nur." In response to this kite an "admin user" replied (16 minutes and 40 seconds later), "You have not had seizure meds since october 2016. Provider will review." The document bears a handwritten notation that says "ESL RN 5/18/17." *Id.* at 91. The parties agree that ESL is Elizabeth Schneider-Loberg. Handwritten notes appear on a printout of Nur's original kite, which is reproduced below. *Id.* at 78.

Subject: Medical Issue
To: adcmedical
From: 86051 Kalsar Faisal Nur 5/9/1988
Date: 5/17/2017 2:43:06 PM
Message:
can u order my siezure medication please. Thanks. Kaisar nur

Seen by medical.

ESL RN

5/18/17, 1444

Spoke c̄ Shelly RN at Dakota County jail,
5/12 - 5/16 ∅ meds. Oct 2016 he was on
dilantan 100mg ER, KEPRA 500mg BID.
ESL RN 5/18/17 ——————

Provider Stella called, do not start Kepra, dilantin
at this time. ESL 5/18/17 ————

077

The parties agree that the notes appear to be in the handwriting of Elizabeth Schneider-Loberg and report on two telephone conversations she had on or around May 18, 2017. The first notation states "Spoke [with] Shelly RN at Dakota County jail, 5/12-5/16 ∅ meds. Oct 2016 he was on dilantin 100 mg ER, Kepra 500mg BID." This notation is signed ESL RN and dated 5/18/17. Below this notation is a second notation: "Provider Stella called, do not start Kepra, dilantin at this time." This notation is also signed ESL and dated 5/18/17. The notes of these two telephone calls and the subsequent typed response to

Nur's original request for medication are the entire record regarding the initial decision not to provide anti-seizure medication to Nur.

About a month later, on June 15, 2017 Nur was seen by MEnD medical staff after he was hit in the head while in the gym. *Id.* at 76. The MEnD Medical Staff Narrative Note signed by Nurse Cheryl Rasmussen noted that Nur "states that he has had previous seizures in the past" and "states as though it feels as though he could have a seizure." *Id.* The ADC sent him to the St. Mary's Emergency Department. *Id.* at 49-50, 76. The MEnD Medical Appointment Transfer form notes Nur's "seizure history." *Id.* at 49. The form says the "reason for transferring" Nur to St. Mary's after the gym incident was his "head trauma, slow neuros, GSW [gun shot wound] to head [in 2005]." *Id.* at 50.

On September 23, 2017 Nur sent another message to the ADC medical provider stating, "When are u guys gonna start me on my seizuer meds." This note is signed ESL RN and dated 9/24/17. *Id.* at 68. Having received no reply by the following day, Nur sent another email asking "When are you guys gonna start me on my sizuer meds." Dkt. No. 62 at 66. An "admin user" replied "Mr. Nur, You have not needed these here and our provider is choosing not to start them. This has been addressed on May 18, 2017. medical." *Id.* This note is also signed ESL RN and dated 9/24/17. *Id.*

On September 27, 2017 Nur sent a message to the medical provider that states: "I keep on alerting your department of my request for my seizure medication, i am continuously receiving replies of denial for it. My purpose of requesting for my seizure medication is because my body is telling me I need it through symptoms im feeling. Im continuously being refused and i don't know why or for what reasons why . . . ." *Id.* at 64. An "admin user" replied two days later on September 29, stating "The provider has

reviewed your chart and determined that there is no need for seizure medications at this time. If you would like, medical can discuss your symptoms and possibly address those specifically." This reply is unsigned. *Id.*

On October 15, 2017 Nur assaulted a fellow detainee. During the incident he was tased by a detention deputy at the ADC. *See* R&R at 4-8, Dkt. No. 48. It is undisputed that upon being tased Nur fell to the ground and suffered a seizure. The incident is captured on video, which is part of the record in this case. Howard Aff. Ex. A, Dkt. No. 32. In response to his seizure Nur was taken to the Emergency Department of St. Mary's Hospital, Mayo Clinic. Howard Dep. Tr. 26, Dkt. No. 33-1. Records from the Emergency Department state:

> The patient has a history of seizure disorder but has not had a seizure in many years. . . . The patient went into a seizure [as a result of being tased] and was afterwards was [sic] postictal. . . . We are going to obtain a CT of the brain and neck given the reported head trauma. We will also try to find out why [sic] medications he is taking. Since this is a provoked seizure, we will likely be able to discharge him home.
>
> * * *
>
> Apparently the patient also had a witnessed seizure after he was taken to the ground. . . . It is unclear how long the seizure lasted for. . . . He has previously been on Dilantin but has not been receiving this in prison.

Dkt. No. 62 at 27. The emergency room physician discharged Nur, noting "Regarding the patient's seizure, ultimately it seems as though he has a known seizure disorder and has not been receiving his Dilantin. I load the patient with Dilantin here in the emergency department under cardiac monitoring. I then prescribe a short 1 week course of Dilantin for him so that his prison physicians can continue this. I have spoken with the neurology resident [who has] kindly arranged for epilepsy Clinic follow-up for the patient. I provided the patient and the deputies present with the patient with the information for how to follow

up in the epilepsy clinic. They will call and get him seen next week." *Id.* at 28. The Olmsted County ADC did not thereafter have Nur seen for follow-up care in the Mayo epilepsy clinic. Nur Dep. Tr. 24, Dkt. No. 44-1. He was, however, kept on anti-seizure medication for the remainder of his time at the ADC. Ross Dep. Tr. 32, Dkt. No. 61-1.

## CONCLUSIONS OF LAW

### I.    Standard for Summary Judgment

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the lawsuit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* In assessing whether a genuine dispute exists, the Court views the evidence in the light most favorable to the nonmoving party and affords him all reasonable inferences. *Rooney v. Rock-Tenn Converting Co.*, 878 F.3d 1111, 1115 (8th Cir. 2018).

The moving party bears the initial responsibility of identifying the basis for its motion and the portions of the record that it believes demonstrate the absence of a genuine dispute of material fact. *Bedford v. Doe*, 880 F.3d 993, 996 (8th Cir. 2018). Only if the moving party satisfies the initial burden must the nonmoving party then present evidentiary materials of specific facts showing the presence of a genuine issue for trial. *Id.* at 997; *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (*en banc*). The nonmoving party must do more than raise some metaphysical doubt about the material facts and cannot rest on mere denials or allegations. *Id.* Rather, the nonmovant must present enough evidence so that a jury could reasonably find in his favor. *Id.*

## II.     Nur's Eighth Amendment Cause of Action Must be Dismissed

The first of Nur's two causes of action in his Amended Complaint is "Defendants' Failure to Provide Adequate Medical Care in Violation of the 8th Amendment." Am. Compl. ¶¶ 27-29 (First Cause of Action), Dkt. No. 50. However, Nur was a pretrial detainee at the Olmsted County ADC awaiting trial on an assault charge. Booking Card, Dkt. No. 32-2 at 1. Therefore, his deliberate indifference claim arises under the due process clause of the Fourteenth Amendment rather than the cruel and unusual punishment clause of the Eighth Amendment, though the Court applies the same standard to his claim that Defendants' conduct was unconstitutional. *See Barton v. Taber*, 820 F.3d 958, 964 (8th Cir. 2016) (applying Eighth Amendment standard to pretrial detainee's claim of failure to provide medical care in violation of the Fourteenth Amendment's due process clause). Accordingly, the Court recommends that the Eighth Amendment cause of action (Count I) be dismissed in its entirety.

## III.     Claims Against MEnD and Olmsted County

Nur's Second Cause of Action is pleaded as "Defendants' Failure to Provide Adequate Medical Care in Violation of the 14th Amendment." Am. Compl. ¶ 30, Dkt. No. 50. Because Nur's Amended Complaint purports to plead his Fourteenth Amendment claims against all Defendants the Court will analyze those claims pleaded against MEnD and Olmsted County first.

A municipality may be held liable under § 1983 for a constitutional violation that resulted from (1) an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train. *Atkinson v. City of Mountain View*, 709 F.3d 1201, 1214 (8th Cir. 2013) (citing *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 690-

91 (1978) and *City of Canton v. Harris,* 489 U.S. 378, 388 (1989)). Nur must establish causation, *i.e.*, that the policy, custom, or failure to train was the "moving force" behind the constitutional violation. *City of Canton*, 489 U.S. at 389-91; *Monell*, 436 U.S. at 691. Generally, an isolated incident of misconduct cannot as a matter of law establish a policy or custom creating municipal liability under § 1983. *Ulrich v. Pope Cty.*, 715 F.3d 1054, 1061 (8th Cir. 2013). A municipality cannot be held liable on a *respondeat superior* theory for the actions of an individual employee. *Monell*, 436 U.S. at 691.

*Monell* claims are typically brought against government entities such as Olmsted County, but courts have held that a medical provider such as MEnD who contracts with a jail may also be sued under § 1983 on a *Monell* theory. *See Brenner v. Asfeld,* No. 18-cv-2383, 2019 WL 2358451, at *8 (D. Minn. June 4, 2019) (citing *Buckner v. Toro,* 116 F.3d 450, 453 (11th Cir. 1997)); *Shields v. Ill. Dept. of Corrections*, 746 F.3d 782, 789, 796 (7th Cir. 2014) (affirming summary judgment for private company providing medical care to prisoners because the "isolated incidents do not add up to a pattern of behavior that would support an inference of a custom of policy"); *see also Lux by Lux v. Hansen*, 886 F.2d 1064, 1067 (8th Cir. 1989) (in non-prisoner/detainee case, no evidence of policy or custom upon which to predicate liability of private mental health care company).

MEnD and Olmsted County[6] argue summary judgment is appropriate because Nur neither pleaded nor offered evidence of a policy or custom on which to base *Monell* liability. Def. Br. 13, Dkt. No. 60; Def. Reply Br. 9-10, Dkt. No. 68. The Court agrees. Nowhere does the Amended Complaint allege that the deliberately indifferent conduct

---

[6] Olmsted County filed a separate summary judgment motion but not a separate memorandum of law, instead joining the memorandum and exhibits filed by MEnD. *See* Motion, Dkt. No. 65; Def. Br. 2 n.1, Dkt. No. 60.

Nur complains of was done pursuant to any policy or custom.[7] The "Facts" section does not identify any policy or custom. *See* Am. Compl. ¶¶ 11-26, Dkt. No. 50. The only mention of a "practice and custom" is a single conclusory paragraph in his Eighth Amendment cause of action in which he cites a 2011 Eighth Circuit decision that affirmed liability imposed on the director of the Olmsted County ADC for deliberate indifference to the medical needs of a paraplegic state prisoner. *See id.* ¶ 28 ("Olmsted has a practice and custom of failing to provide adequate medical care and treatment to pretrial detainees as exemplified in <u>Phillip Schaub v. Steven VonWald</u>, 638 F.3d 905 ([8th Cir.] 2011). This practice and custom continues to the present day and has involved numerous other detainees since 2011.").

Nur argues that other lawsuits, when added to his, are evidence of a current or continuing custom of deliberate indifference to the medical needs of detainees at the ADC. Pl. Br. 9-10, Dkt. No. 66. He contends the "custom or usage that may be most disturbing . . . is that [] MEnD 'medical providers' like Essien make decisions about medical care without having a detainee's medical record before them" and that "[o]ne must assume that this custom or usage happens across the board within MEnD and is widely accepted and practiced by its employees." *Id.* at 10.

But Nur paints with too broad a brush. He complains of Essien's conduct in this case, then labels it a "custom" and asks the Court to "assume" the practice is widespread.

---

[7] Nur does, however, allege that MEnD *failed* to follow certain unidentified policies when Nur was booked into the jail. *See* Am. Compl. ¶¶ 15-16 ("Violating its own policies and procedure, MEnD failed to complete a Receiving Screen Form/Booking form for Nur when he was initially booked into the ADC in May, 2017." "Violating its own policies and procedures, MEnD failed to complete a comprehensive health assessment for Nur within fourteen days after he was booked into the ADC in May, 2017."), Dkt. No. 50.

But he has not pointed to any facts in the two cases he cites, *Brenner* and *Schaub*, that, combined with the facts here, are evidence of a custom. *Brenner* is an ongoing lawsuit arising out of a 2017 suicide in the Sherburne County Jail. It involves MEnD but not Olmsted County.[8] Nur has not offered any evidence from that lawsuit to support the existence of a custom that caused the alleged constitutional violation here.

*Schaub* is a 2011 Eighth Circuit decision that affirmed a judgment against the director of the Olmsted County ADC for deliberate indifference to the medical needs of a paraplegic inmate in 2003. It did not involve MEnD. *Schaub v. VonWald,* 638 F.3d 905, 909-11 (8th Cir. 2011). The Eighth Circuit also noted that the district court had granted summary judgment in favor of Olmsted County on the *Monell* claim. *Id.* at 914. There is nothing to connect the 2003 events in *Schaub* to the 2017 events involving Nur.

Nur has neither pleaded nor offered evidence of a policy or custom that allegedly caused the deliberately indifferent conduct of which he complains. Accordingly, any *Monell* claims against Olmsted County and MEnD fail as a matter of law, and the Court recommends they be dismissed.[9]

## IV.  Nur's Fourteenth Amendment Claim Against the Individual Defendants for Deliberate Indifference

Count II of Nur's Amended Complaint alleges that the individual Defendants failed to provide constitutionally adequate medical care in violation of the Fourteenth Amendment.

---

[8] According to the public docket, the *Brenner* lawsuit is ongoing and liability, if any, has not been determined. *Brenner v. Asfeld,* District of Minnesota Case No. 18-cv-2383.
[9] Nur also sued MEnD employees Essien and Schneider-Loberg in their "official capacities," and any official capacity claims against them should also be dismissed.

### A.    Legal Standard

The standard applied to a pretrial detainee's Fourteenth Amendment deliberate indifference claim is the same as that which is applied under the Eighth Amendment. *Walton v. Dawson*, 752 F.3d 1109, 1117 (8th Cir. 2014). To prevail on this claim Nur must prove Defendants acted with deliberate indifference to his existing serious medical needs or to conditions posing a substantial risk of future harm. *Weaver v. Clark*, 45 F.3d 1253, 1255 (8th Cir. 1995) (comparing *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976) (existing serious medical needs) with *Helling v. McKinney*, 509 U.S. 25, 35 (1993) (substantial risk of serious harm)).

A deliberate indifference claim has two components, an objective one and a subjective one. *Butler v. Fletcher*, 465 F.3d 340, 345 (8th Cir. 2006). The objective component requires that Nur demonstrate he had an objectively serious medical need. *Moore v. Jackson*, 123 F.3d 1082, 1086 (8th Cir. 1997). The subjective component requires that Nur establish Defendants knew of and disregard that need. *Krout v. Goemner*, 583 F.3d 557, 567 (8th Cir. 2009). Each step of this inquiry is fact-intensive. *Coleman v. Rahija,* 114 F.3d 778, 784 (8th Cir. 1997).

### B.    Serious Medical Need

Defendants assert they are entitled to summary judgment because the undisputed evidence cannot as a matter of law establish Nur had a serious medical need. An objectively serious medical need is one that is either so obvious that even a layperson would recognize the necessity for a doctor's attention or one that has been diagnosed as requiring treatment. *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995). In this case, Defendants allege that Nur "has not presented any medical records demonstrating a

diagnosis for a seizure disorder" and therefore as a matter of law cannot demonstrate an objectively serious medical need. Def. Br. 8, Dkt. No. 60. Given the summary judgment standard, however, the correct question in the first instance is whether Defendants have established the absence of any genuine dispute of material fact on the question whether Nur had a serious medical need. But whether analyzed as a question of Defendants' initial burden or of Nur's responsive burden the result here is the same. There is sufficient evidence in the record from which a reasonable factfinder could find that Nur had a serious medical need.

Defendants' primary argument is that Nur has provided no medical records demonstrating a diagnosis of a seizure disorder. *Id.* They concede a seizure disorder is a serious medical need[10] but only if it has been supported by "verifying medical evidence." *Id.* (citing *Dulany v Carnahan*, 132 F.3d 1234, 1243 (8th Cir. 1997)).[11] Defendants argue that Nur has presented no such evidence. This is wrong.

When Nur arrived at the Olmsted County ADC the record unequivocally establishes that he informed the ADC of his seizure disorder. The Booking Card and the Completed Questionnaire both indicate that Nur has seizures, his most recent having occurred just four or five months before his arrival at the ADC. Dkt. No. 32-2 at 1, 7. In

---

[10] *See* Motion Hearing Transcript at 2-3, Dkt. No. 72.

[11] Defendants also cite *Coleman v. Rahija*'s statement that "[a]n inmate's failure to place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment precludes a claim of deliberate indifference to medical needs." Def. Reply Br. 9, Dkt. No. 68; *Coleman*, 114 F.3d at 784-85 (medical evidence established detrimental effect of prison's two-hour delay in transporting a pregnant inmate to the hospital for pre-term birth, thus her condition constituted an objectively serious medical need). But this is not a delay-in-treatment case, it is a failure-to-treat case. Defendants never provided Nur with his seizure medication in response to his repeated requests. Only after he came back from the Mayo Emergency Department, which provided him with Dilantin, did Defendants then continue to provide his medication to him.

addition, a MEnD Medical Inmate Transfer Form says that Nur "states he has epilepsy." Dkt. No. 62 at 40. The Health Assessment form filled out at the Dakota County Jail also indicates, again by Nur's self-report, that he had seizures in 2016. *Id.* at 131. Similarly, a MEnD Medical Appointment Transfer form notes Nur has a seizure history. *Id.* at 49-50. In addition, his requests for medication clearly indicate he has stated he has a seizure disorder and that he needs his prescribed anti-seizure medication. Defendants assert that these statements are insufficient to establish a serious medical need because they are mere "self-reports."

There are two problems with this argument. First, there are myriad serious medical conditions that are not readily visible to the naked eye but necessarily rely on a self-report in the first instance. Epilepsy is surely such a condition. So too are diabetes, Hepatitis C, HIV, and many other serious medical conditions. In the first instance a detainee who suffers such a medical condition must necessarily self-report it to the jail. It cannot be gainsaid that such a condition is a serious medical need. In the facts and circumstances of this case, Nur's self-report gave rise to a duty to investigate to the extent necessary to allow Defendants to respond appropriately.

But these observations really go to the issue whether Defendants were deliberately indifferent to the medical need (if it existed). The objective inquiry focuses on whether Nur has presented evidence from which a factfinder could reasonably conclude he had a serious medical condition at the time the care was withheld. If the only thing in the record were these few self-reports by Nur to the ADC, Defendants might have a point. But it is not.

Defendants overlook medical records in their own file, some of which predate Nur's detention at the ADC. An August 20, 2014 record from the Minnesota Department of Corrections (DOC) at Rush City states that Nur has a "history of seizure that may have been triggered by Wellbutrin therapy in 8/2012." *Id.* at 15. The record notes he was on Wellbutrin therapy "for several months." *Id.* at 14. A June 8, 2015 medical record from the DOC at Moose Lake states: "Medical History: . . . History of seizures. Offender reports first seizure in 2013 while taking Wellbutrin. He states his last seizure was 10/2014 while incarcerated in jail." *Id.* at 10. That same record lists current medications as including a medication "for seizure disorder." *Id.* In addition, medication sheets in the possession of the Olmsted County ADC indicate that in September of 2015 Nur was on Dilantin for seizures. *Id.* at 6. The Health Assessment from Dakota County lists seizures occurring in 2016. *Id.* at 131.

Defendants try to negate the June 8, 2015 medical record by asserting that the "same psychiatrist" "erased" the seizure diagnosis and seizure medication two months later. They argue, "More telling, in a follow-up appointment on August 26, 2015 with the same psychiatrist, there was no mention of a seizure disorder, the 'history of seizures' diagnosis was erased, and the seizure medication Plaintiff had on June 8, 2015 was no longer part of his active medication." Def. Reply Br. 3, Dkt. No. 68. But the August 26, 2015 record does not "tell" what Defendants claim it does. First, the June and August appointments were with different people, not the "same psychiatrist." Nur's June appointment was with "Debra Zinken, RN, CNP," a nurse practitioner, not a psychiatrist. Dkt. No. 62 at 12. His August appointment was with "Robert Fornal, MD," who presumably is a psychiatrist given the nature of that appointment. *Id.* at 8. While both records identify

"Andrew Hull" as the "Primary Behavioral Health Provider" (June record) or "Mental Health Provider" (August record), neither record says Hull is a psychiatrist or suggests that he was involved in any way with the June or August appointments. It appears the August appointment was a required follow-up to assess how a new medication, clonidine, was working. *See id.* at 11 ("I did review with him potential risks, benefits, and side effects of clonidine. He . . . understands he will be seen in two months for a followup visit."), 8 ("At the last visit, 06/08/2015, clonidine was added to see if it could help").

The June record is four pages, while the August record is a single page, but on their face they do not support the inferences Defendants attribute to them. Contrary to Defendants' contention, there is no basis whatsoever to conclude that Dr. Fornal assessed Nur's seizures or his seizure medication (or was even qualified to do so), much less that he made a medical determination to "erase" Nur's "'history of seizures' diagnosis" or his prescription for seizure medication during the August 26, 2015 visit. It is simply a more truncated record as compared to the more complete history found in the June 8, 2015 record. *See id.* at 8-12.[12] The August 26, 2015 record is not evidence that Nur did not have a serious medical need.

Most importantly, Defendants also overlook the records from the Mayo Clinic Emergency Department. These medical records state that "it seems as though he has a known seizure disorder and has not been receiving his Dilantin." *Id.* at 28. This same entry indicates "[t]he patient has a history of seizure disorder but has not had a seizure in

---

[12] One September 2015 medication sheet shows his Dilantin prescription [Dkt. No. 62 at 6] and another says it was discontinued on September 22, 2015 [*id.* at 7]. The Court infers, without needing to decide, that the discontinuation date reflects the fact that Nur was released on that date and was no longer under their care. *See id.* at 8 ("his release . . . will occur 09/22/2015").

many years." *Id.* at 27. The discharge plan formulated by the Mayo Clinic Emergency Department states, in relevant part:

> Regarding the patient's seizure, ultimately it seems as though he has a known seizure disorder and has not been receiving his Dilantin. I load the patient with Dilantin here in the emergency department under cardiac monitoring. I then prescribe a short 1 week course of Dilantin for him so that his prison physicians can continue this. I have spoken with the neurology resident was [sic] kindly arranged for epilepsy Clinic follow-up for the patient. I provided the patient and the deputies who present with the patient with the information for how to follow up in the epilepsy clinic. They will call and get him seen next week.

*Id.* at 28.

Defendants disregard these other records on the grounds that they too merely reflect Nur's own self-reports of a seizure disorder. They also ridicule Nur's competence to give the Mayo physician accurate information (and mock his being tased in the head), suggesting he was too addled post-seizure to accurately tell the physician about his history of seizures. *See* Def. Reply Br. 4 ("the emergency room doctor . . . relied on Plaintiff's description of his history at the emergency department — after being struck in the head with a taser"), Dkt. No. 68. While many (though not all) of the records do seem to reflect Nur's self-report, they are nonetheless medical records that do not question the accuracy of that history. Moreover. some of the records are not self-reports, such as the medication logs indicating that Nur has been prescribed Dilantin for seizures in the past. Most tellingly, the Mayo Clinic Emergency Department record is not merely a self-report but reflects the Mayo physician's medical judgment, which included "loading the patient up with Dilantin" and scheduling him for further care in the Mayo Epilepsy Clinic.

Defendants attempt to minimize the significance of the Mayo record by arguing that the physician put Nur on Dilantin merely "out of an abundance of caution." Def. Br. 5,

Dkt. No. 60. But the medical record does not say that. Anywhere. The Mayo doctor has not been deposed or submitted an affidavit. There is no competent evidence to support Defendants' characterization. And their own records indicate otherwise. "Out of an abundance of caution" suggests a precaution taken (perhaps unnecessarily) against a very small or remote risk. But the ADC's own post-October 15, 2017 medical records show the handwritten note "*critical*" next to Nur's Dilantin prescription. *See* Dkt. No. 62 at 111, 115, 121.

Defendants also downplay the significance of the fact that the limited medical records in the case establish that Nur was on prescription Dilantin for seizures. They argue Nur was only on the medication for a short time and that he had not taken it for years. But these assertions of fact are also not established in the record. The fact that the medication sheet from one period lists Dilantin does not establish that Dilantin was not prescribed during periods for which there are no records.[13] To the extent Defendants rely on the statement attributed to Nur on their Completed Questionnaire, Nur denies it is accurate. Nur Dep. Tr. 22-23, Dkt. No. 44-1.

---

[13] It is true that some medication logs from discrete periods of time do not list prescription anti-seizure medications. The medical records Defendants provided to the Court are not continuous and there are substantial gaps in time for the periods that these records cover. *See* Dkt. No. 62. Nor have Defendants provided any explanation of the medical records submitted other than that they are "a true and correct copy of Plaintiff's medical records from the Olmsted County Jail." Novak Aff. ¶ 2, Dkt. No. 61. The Court does not see any certification by a records custodian or other authority attesting that this is Nur's entire medical file. Ross, the Rule 30(b)(6) witness, did not testify she was a records custodian and said only that the documents shown to her at her deposition were "the only documents I'm aware of." Ross Dep. Tr. 28, Dkt. No. 61-1. The only accurate conclusion one can draw from the records is that they describe a history of seizures and reflect the fact that Nur has had a prescription for anti-seizure medication.

Finally, Defendants argue that no reasonable juror could find Nur had a true seizure disorder requiring medication because all of his seizures were provoked. They argue:

> * * * Plaintiff's medical records are devoid of any spontaneous seizure or diagnosed seizure disorder. Plaintiff's seizures have always been provoked. The only seizure noted in the records before October 15, 2017 resulted as a side effect of a medication. Plaintiff's October 15, 2017 seizure was noticeably preceded by (and provoked by) a taser strike to his head. These provoking events are more obvious explanations for Plaintiff's seizures than an undiagnosed disorder. Since Plaintiff's records do not show Plaintiff otherwise experiences seizures, it is not "so obvious" that Plaintiff needs medication to treat his alleged, but undiagnosed, seizure disorder. Therefore, Plaintiff has failed to establish a serious medical need.

Def. Br. 9, Dkt. No. 60.

This argument is inaccurate. To begin, Defendants overstate the record regarding Nur's seizure in 2012. The medical record states that the seizure "***may*** have been triggered by Wellbutrin therapy," not that it was definitively determined to have been so. Yet Defendants assert this as an established fact.[14] But they cannot turn an hypothesis (the seizure "may have been provoked") into a definitive medical conclusion that they then use to assert there is no triable issue on whether Nur had a serious medical condition. In addition, Defendants are demonstrably wrong in asserting no other seizure occurred between the 2012 seizure[15] and the October 15, 2017 seizure. The records report

---

[14] This is a pattern in Defendants' motion papers as they regularly overstate or misstate the content of the contemporaneous medical records.

[15] Various documents list this seizure as occurring in either 2012 or 2013, but they all note it as occurring while Nur was taking Wellbutrin. None of the records regarding this seizure state it was in fact a reaction to the Wellbutrin, only that it may have been. *See, e.g.,* Dkt. No. 62 at 10 ("Offender reports first seizure in 2013 while taking Wellbutrin. He states his last seizure was 10/2014 while incarcerated in jail."), 12 ("History of seizures, 2013, possibly related to Wellbutrin therapy, most recent seizure 10/2014.").

seizures occurring in 2014 [Dkt. No. 62 at 10, 12] and in late 2015 or early 2016 [Dkt. No. 32-2 at 7]. Nothing in the records indicates these seizures were "provoked."

Defendants also rely on the testimony of Physician Assistant (PA) Amanda Ross, their Rule 30(b)(6) witness. She did not treat Nur and has no independent knowledge of his medical condition or his treatment. Notwithstanding, Ross testified that Nur could not have had a diagnosis of seizure disorder because (1) all of his seizures were provoked and (2) he had been off medication for several years without a seizure, which is unusual if someone has a true seizure disorder. Ross Dep. Tr. 6-7, 16, 19, 23, 26, Dkt. No. 61-1. But, as to her first point, the record does not support the assertion that all of Nur's seizures were provoked, as discussed above.

As to Ross's second point, Defendants again take liberties with the record. There is not a single record stating that Nur has been off medication for several years. The records submitted to the Court are scant and cover only a short period of time, with significant and obvious gaps. The primary evidence Defendants cite for the proposition that Nur was off medication for several years is the note of the telephone call with Dakota County. Defendants claim those notes state that as of May 2017 Nur had not been on Dilantin since October 2016. But the notes do not say that. The note states "Oct 2016 he was on Dilantin . . . ." The notes do *not* state he was off Dilantin after October 2016, let alone why and for how long. Defendants simply fill in gaps in the record with facts they wish were established and then offer those "facts" to meet their initial burden under Rule 56. There is no support in this record for Ross's second factual premise that Nur was off medication for a lengthy period of time.

Nor is PA Ross's conclusion from this false premise warranted. Ross concludes that Nur could not have a true seizure disorder because he was seizure-free during what she believes was a medication holiday. Her testimony is insufficient to establish the absence of a serious medical need for several reasons. First, as noted, there is no evidence Nur was without his medication for an extended period of time (and Nur in fact denies this). Nor do the records establish when Nur had this supposed holiday or whether he was seizure-free during that period. For example, Defendants assert that Nur was off medication from October 2016 to May 2017 (though there is no evidence of that), yet ignore the fact that Nur reports he had a seizure during that very period. *See* Dkt. No. 32-2 at 7.

But even assuming Nur was off medication and was seizure-free, Ross's testimony merely states that it is *unusual* for someone with a true seizure disorder to go without medication for an extended period of time and not have a seizure. Ross Dep. Tr. 23, Dkt. No. 61-1. But atypical or unusual is not the same thing as "cannot happen." Even if Ross's factual predicates are accurate (for which there is no evidence), her testimony is not enough to demonstrate the absence of a genuine issue of material fact. All this testimony does is further establish that a genuine issue of material fact exists.

Lastly, Defendants argue that:

> In the interim between Plaintiff's provoked seizures, Plaintiff was seen by medical providers other than the MEnD Defendants (e.g., providers at Dakota in May 2017 and St. Mary's in June 2017). None of those providers determined Plaintiff should be started on seizure medication. This unanimous conclusion is sensible because Plaintiff's medical records are devoid of any spontaneous seizure or diagnosed seizure disorder.

Def. Br. 9, Dkt. No. 60. This argument is disingenuous at best. The reference to "providers at Dakota" refers to the providers at the Dakota County Jail. The Olmstead County ADC

sent him there to make a court appearance. Am. Compl. ¶ 19, Dkt. No. 50. The record

does not say Dakota County considered (or was ever asked to) and determined not to

place Nur on anti-seizure medication. It merely states that to their knowledge he was not

on that medication during the five days he was in their facility. Dkt. No. 62 at 78. The

Medical Inmate Transfer Form sending Nur from the ADC to Dakota County, and Dakota

County's initial Health Assessment form (which is on MEnD letterhead) report that Nur

"states he has epilepsy" and had a seizure in 2016. *Id.* at 40, 131. Nowhere does this

record say that Dakota County was asked to consider or did consider whether Nur should

be on anti-seizure medication. Nur did not ask for his seizure medication until he returned

to the ADC. The wording of his request—"can u order my seizure medication please"—is

consistent with an inference that he was on medication but did not have it with him when

he was booked at the ADC. It is misleading to say that Dakota County reached a

deliberate "conclusion" not to "start" Nur on anti-seizure medication.

Similarly, the record from June 2017 does not support Defendants' argument. Nur

sustained a blow to his head in the gym at the ADC and was taken to St. Mary's for

evaluation of that injury. Dkt. Nos. 49-50, 76. The MEnD records only reflect Nur's transfer

to St. Mary's. There is nothing in the record to suggest that St. Mary's evaluated Nur for

seizures or the need for medication during this visit, much less that any provider at St.

Mary's made a medical determination that he did not need such medication.

To describe these three records as reflecting a unanimous medical consensus that

Nur did not need seizure medication is more than the record can bear. It simply cannot

be said based on those records that, as a matter of law, no reasonable jury could find Nur

had a serious medical condition when he was detained at the ADC. The records

themselves demonstrate that a reasonable juror could find Nur had a serious medical condition for which he had been prescribed a treatment regimen of anti-seizure medications. More fundamentally, however, Defendants would have this Court grant summary judgment by simply ignoring the deposition testimony of Nur himself. Nur testified that he had been diagnosed as having a seizure disorder for which he had been placed on anti-seizure medication. Nur. Dep. Tr. 6, 8, Dkt. No. 44-1.[16] Defendants would have this Court simply reject this sworn testimony as evidence. But their argument confuses the question of whether there is evidence of a diagnosed condition with the question of the quality of that evidence. Nur is competent to testify about his medical diagnosis and treatment. His testimony is not inconsistent with his medical records. That Defendants disbelieve his testimony does not render it incompetent or immaterial.[17] It may well be that a jury too will disbelieve Nur or find his testimony insufficient to establish a serious medical need. They may want Nur to come forward with more compelling medical records of his diagnosis and may challenge his failure to do so at trial should he fail to submit such evidence. But it is not for this Court (or Defendants) to simply find Nur's testimony incompetent, particularly in light of the medical records that have been placed into evidence.

Defendants point to no precedent to establish that Nur's sworn testimony of his diagnosis and treatment, paired with the medical records showing he was treated with medication for his seizures, is not competent evidence of a serious medical condition.

---

[16] Nur also testified that he had always been given his medication when he was incarcerated, except when at the Olmsted County ADC. Nur Dep. Tr. 6-8, Dkt. No. 44-1.
[17] Though Nur testified he had been diagnosed, Defendants' counsel did not probe for any details regarding that diagnosis such as who rendered it, where, and when.

They cite *Dulany* to suggest that Nur has the burden to come forward with medical records that establish a definitive diagnosis of epilepsy. Def. Br. 8, Dkt. No. 60. *Dulany* holds no such thing, and its dissimilarity to the present case highlights the point. *Dulany* was a purported class action that alleged a systemically deficient health care system. The fighting issue in *Dulany* was not serious medical need but rather deliberate indifference, *i.e.,* did prison officials respond in a reasonable, constitutionally adequate way. There the court was presented with "many volumes of medical records" documenting the named plaintiffs' course of treatment, from which it could conclude the "defendants acted reasonably in response" to their serious medical needs. *Dulany,* 132. F.3d at 1237, 1243. The inmates "failed to present evidence refuting the objective medical records sufficient to give rise to an inference of deliberate indifference." *Id.* at 1244.

In those instances where a *Dulany* named plaintiff failed to demonstrate a serious medical need, it was because the extensive records expressly refuted it. For example, inmate A.D. alleged she had Crohn's disease, but "many diagnostic procedures for abdominal pain ruled out any diagnosis of Crohn's disease. Medical records also indicate that [A.D.] has been sent to outside consultants who have not concluded she suffers from Crohn's disease." *Id.* at 1240. Therefore, there was "no evidence to indicate that the prison medical officials did not respond reasonably to her medical needs." *Id.* Inmate B.H. asserted she suffered from carpal tunnel syndrome, but "[p]rison doctors have sent [A.H.] to a specialist, prescribed medication, and performed diagnostic procedures for her. The specialist found no indication of carpal tunnel." *Id.* at 1242.[18] *Dulany* is simply inapposite

---

[18] For some *Dulany* plaintiffs it was unclear whether the particular incident involved a "serious medical need" but, regardless, the court found the medical records demonstrated that prison officials responded reasonably and/or their response did not support an

to the circumstances here.  Nur's medical records do not rule out a seizure disorder, nor do they demonstrate as a matter of law that Defendants' response was reasonable. Rather, the records raise a triable issue whether Nur had a serious medical need.

Defendants also cite *Jolly v. Knudsen*, 205 F.3d 1094 (8th Cir. 2000), for the proposition that medical records showing that providers relied on Nur's self-reported seizures when treating him are "not enough." They suggest Nur's self-reports are akin to the "unsupported speculation" that was rejected in *Jolly*.  Def. Reply Br. 4-5, Dkt. No. 68. But *Jolly* is readily distinguishable. The prison physician in *Jolly* increased the dosage levels of the inmate's anti-seizure medications, after which the inmate suffered side effects and the physician adjusted the medications. *Jolly*, 205 F.3d at 1096. The inmate contended the increase in dosage levels was detrimental to his health and reflected the physician's deliberate indifference to his well-being. *Id*. The physician responded with an affidavit stating that the reason he initially increased the dosage levels was because blood tests indicated the concentrations of the medications in the inmate's blood were at sub-therapeutic levels. *Id*. at 1096-97. The inmate "presented no evidence beyond his own unsupported speculation that this was untrue." *Id*. at 1097. The court affirmed summary

---

inference of deliberate indifference. For example, inmate L.A. suffered from a cardiac condition and on one occasion prison officials took her to a hospital for chest pains. "Medical records indicate that the emergency room physician determined that her chest pain was non-cardiac, and she was instructed to continue her current medications." *Id*. at 1243. Inmate P.P. claimed "prison medical staff extracted the wrong tooth. Medical records show that two teeth needed extraction, and she presented no evidence but her own opinion to refute the medical record." *Id*. And even if P.P. was correct, "medical malpractice does not amount to deliberate indifference." *Id*. The *Dulany* court found no named plaintiff had raised a fact question to support a deliberate indifference claim. *Id*. at 1239 ("while most of the plaintiffs had alleged serious medical needs, none had raised a genuine dispute of fact . . . that the prison officials had been deliberately indifferent to her serious medical needs.").

judgment for the physician. *Id.* at 1098. The court in *Jolly* found the inmate could not rely on only his own "unsupported speculation" to rebut the physician's stated reason for changing the dosage. Nothing in *Jolly* says that a patient's statements to medical providers about his own medical conditions or history constitute "unsupported speculation."

The law defines a serious medical need as one "diagnosed by a physician as requiring treatment." *Camberos,* 73 F.3d at 176. Defendants focus on the "diagnosed" language rather than the "treatment" aspect of the definition. They thus argue that the records must show diagnostic tests or a formal diagnosis in order to defeat summary judgment.[19] But Defendants have cited no authority that says this. It is probably true that most cases have better medical records than this case, and those records likely include more explicit diagnostic documentation than we have here. But the definition of "serious medical need" is tied to treatment of the condition ("diagnosed . . . as requiring treatment"), and the records here show Nur's treatment with seizure medication. *See Camberos,* 73 F.3d at 176-77 ("district court found that [inmate's] shoulder injury, having been treated by a doctor . . . constituted a serious medical need."). Nur's self-reports do not invalidate the records, and his deposition testimony is consistent with those records. In this case, the medical and other records show Nur had a history of seizures; do not show that his history includes only provoked seizures; and show that physicians (or other medical

---

[19] *See, e.g.,* Def. Br. 1 ("Plaintiff has never been diagnosed with a seizure disorder"), 2 ("Plaintiff had no diagnosed seizure disorder"), 3 ("he had no specific seizure disorder diagnosis, and no history of diagnostic testing to confirm a disorder"), 8 ("Plaintiff has not presented any medical records demonstrating a diagnosis for a seizure disorder"), 9 ("Plaintiff's medical records are devoid of any . . . diagnosed seizure disorder"; "his alleged, but undiagnosed, seizure disorder"), Dkt. No. 60.

providers) prescribed seizure medication to treat his condition. This is sufficient evidence to support a claim that Nur had a serious medical need "diagnosed by a physician as requiring treatment." Nur's testimony, the medical records, and the fact that he was treated with seizure medication is sufficient to, at a minimum, create a fact question whether he had a serious medical need. Defendants have failed to carry their initial burden of establishing the absence of a genuine issue of fact concerning Nur's serious medical need.

### C.   Deliberate Indifference

To prevail on his Fourteenth Amendment claim Nur must show Defendants were deliberately indifferent to his serious medical needs. This subjective component of his claim based on inadequate medical care requires more than mere negligence or medical malpractice. *Dulany*, 132 F.3d at 1239. Rather, deliberate indifference requires "a mental state akin to criminal recklessness." *Barton,* 820 F.3d at 965 (internal quotation marks and citations omitted). "Such a mental state can be inferred from facts that demonstrate" the response to the medical need was "obviously inadequate." *Id.* It may be demonstrated by prison officials who intentionally deny or delay access to medical care or intentionally interfere with prescribed treatment, or by prison doctors who fail to respond to prisoners' serious medical needs. *Estelle*, 429 U.S. at 104-05. "Grossly incompetent or inadequate care can constitute deliberate indifference . . . where the treatment is so inappropriate as to evidence . . . a refusal to provide essential care." *Dulany*, 132 F.3d at 1240-41.

Defendants have put forward no evidence as to their then-existing actual state of mind. Schneider-Loberg has not testified, either by way of deposition or declaration. What she knew, what she did, and why she did it is therefore not established by any direct

evidence. Similarly Essien, the nurse practitioner who denied Nur his medication, has no memory of the events. She cannot testify regarding what decisions she made or why she made them. Essien Dep. Tr. 2-4, 6-7, 10-16, Dkt. No. 44-1. The Court is left to rely on the records that were provided. Those records clearly establish a genuine issue of disputed material fact as to whether Defendants were deliberately indifferent to Nur's serious medical need.

### 1.    Actual Knowledge of Nur's Serious Medical Need

Defendants argue there is no evidence in the record to establish that either Nurse Schneider-Loberg or NP Essien actually knew that Nur had a serious medical need. But it is undisputed that, at the time of their initial denial on May 18, 2017, they knew Nur had asked them to provide "his" seizure medication. They also knew from Nurse Shelly at Dakota County Jail not only that Nur was on seizure medications as of October 2016 but also the specific dosages of each: "Oct 2016 he was on dilantan [sic] 100 mg ER, KEPRA 500 mg BID [twice a day]." Dkt. No. 62 at 78. And there is no question Defendants know that Dilantin and Keppra are prescribed to treat seizures/epilepsy. Beyond that, the record does not show whether Defendants did or did not further investigate, consult any records available to them, or otherwise reach out for additional information to verify Nur's medications or his medical needs. Thus, the record supports an inference that, if they did not know more, it was because they failed to do more to follow up on the information they had. But what they indisputably knew as of May 18, 2017 is sufficient to support an inference of actual knowledge of Nur's serious medical need.

It is true that Nur was not carrying any medication with him when he arrived at the ADC, but we do not know the precise circumstances of his arrival or whether he had an

opportunity to bring medication with him. At oral argument his counsel stated he was arrested and taken to jail without an opportunity to get anything. Mtn. Hrg. Tr. 23, Dkt. No. 72. The fact that he arrived without medication on his person is not conclusive, or even persuasive, evidence here.

To the extent Defendants rely on Nur's booking form (May 7, 2017 Completed Questionnaire) that states he is not on any medications, such reliance is unavailing for at least a couple of reasons. First, the initial booking forms are not filled out by detainees but rather by jail personnel asking questions of the detainees. Nur testified he does not recall telling the questioner he was not taking any medications but does recall telling that person he had seizures. Nur Dep. Tr. 22-23, Dkt. No. 44-1. Second, there is nothing in the record to indicate Defendants actually reviewed or relied on the "no" answer to the medication question on the Completed Questionnaire before they denied Nur his seizure medication on May 18, 2017. There is no documentation in any medical record that they did so, Essien has no memory of the events, and Schneider-Loberg was not deposed and submitted no affidavit. Furthermore, the May 18, 2017 email reply to Nur does not on its face refer to or rely on any information in the Completed Questionnaire. Dkt. No. 62 at 91. Thus, the Completed Questionnaire does not establish as a matter of law that they lacked actual knowledge of Nur's serious medical need.

As to Defendants' subsequent denials on September 24 and September 29 of Nur's requests for his seizure medication, the record does not establish that Defendants based those denials on anything more than a review of their original May 18 denial, plus their observation that Nur had not up until then had a reported seizure during his time at the ADC. *See id.* at 64, 66. It is possible they did, but there is no testimony or medical

documentation of it. It is a disputed fact question. If they reviewed ADC, MEnD, and DOC records, they would have seen references to Nur's history of seizures and being treated with Dilantin and Keppra for them. This is evidence of Defendants' actual knowledge of Nur's serious medical need which, at a minimum, creates a fact question precluding summary judgment.

There is ample evidence in the record from which a jury could find Defendants had actual knowledge of Nur's serious medical need. Thus, Defendants have failed to meet their initial burden under Rule 56 to demonstrate the absence of a genuine dispute of material fact on this element of Nur's deliberate indifference claim. *See Bedford,* 880 F.3d at 996 (moving party can satisfy its burden by identifying the portions of the record that negate an essential element of the nonmoving party's case or that show the nonmoving party does not have enough evidence of an essential element to prevail at trial).

### 2.    Disregard

Given that sufficient evidence in the records supports Nur's claim that Defendants actually knew he had a serious medical need, the question becomes whether they disregarded it. This question requires an analysis of what was done and whether it was constitutionally adequate.

Defendants assert that Nur cannot establish Defendants' disregard because "they investigated and evaluated [his] request for medication and made a decision as medical providers." Def. Reply Br. 7, Dkt. No. 68. Nur's claim, they argue, comes down to a mere disagreement with their treatment decision and fails to establish the level of culpable disregard for his care. Because it is undisputed that Defendants refused Nur his seizure

medication, the question necessarily becomes whether that refusal was based on an adequate inquiry or reflected a reckless disregard of Nur's serious medical need.

Defendants' investigation of Nur's request for anti-seizure medication consisted primarily (and perhaps only) of speaking with "Shelly," the nurse at Dakota County. They argue their actions were reasonable as a matter of law because Schneider-Loberg "verif[ied] Plaintiff's <u>current</u> medications with another (recent) clinic." *Id.* at 8. But Defendants mischaracterize the record. The "clinic" was the Dakota County Jail, to which the ADC itself sent Nur to make a court hearing. He was still under the ADC's care and was only temporarily "off-site," according to the ADC's own records. *See* Dkt. No. 62 at 92 (May 14, 2017 email stating "Patient off-site on a writ."). He returned to the ADC a few days later. Under these circumstances it is a puzzling choice for Schneider-Loberg to call the Dakota County Jail to which the ADC just sent Nur to ask *them* whether he has any prescribed medications. But even so, according to Schneider-Loberg's own handwritten note "Nurse Shelly" in fact told her Nur was on Dilantin and Keppra as of October 2016. *Id.* at 78.

The note memorializing the May 18, 2017 call with Shelly does not establish what Defendants would have this Court accept—that Dakota County informed them Nur had been *off* medication since October 2016. As discussed above, the note simply says that Nur was *on* seizure medication at that time. Defendants have offered no competent testimony to explain the note, let alone to establish what in fact was said. Neither "Shelly" from Dakota County nor Schneider-Loberg has testified to this conversation. Essien was not on this call and does not recall what she was told of the call by Schneider-Loberg. It is equally consistent with this note to infer that Dakota County informed Schneider-Loberg

that Nur did not have his medication during the five days the ADC sent him there but that their records indicate that he was known to be on medication in October 2016 when they last saw him.

Neither the note itself nor Essien can illuminate her reasons for denying Nur's request for his medication. The note of the call simply instructs Schneider-Loberg not to provide it. Moreover, when Nur made his second request for medication on September 23, the response he received was that the matter had already been addressed on May 18. *Id.* at 66. In other words, Defendants undertook no further investigation at that time. Or, if they did, there is no evidence of it.[20]

When Nur again requested his medication on September 27, MEnD declined again, this time saying, "The provider[21] has reviewed your chart and determined that there is no need for seizure medications at this time." *Id.* at 64. Defendants rely on this "chart review" to establish there was no deliberate disregard. However, Defendants' reliance is misplaced. The note does not indicate when this alleged chart review occurred, much less what that chart consisted of. It is a plausible reading of the note—in light of all the facts in the record—that the reference to chart review is nothing more than a reference back to the phone call with Dakota County. If so, this reference reflects no additional investigation by Defendants.

Ross testified the ADC received records from the Minnesota Department of Corrections "in September of 2017," but does not say what date in September or how she

---

[20] This note also states that "you have not needed these [medications] here," indicating that Nur had not experienced a seizure while off medication at the ADC. This fact cannot establish the adequacy of withholding Nur's medication any more than a diabetic's not experiencing ketoacidosis would establish the adequacy of withholding insulin.
[21] The record does not indicate who "the provider" is.

knows the records were received in September. Ross Dep. Tr. 16, Dkt. No. 61-1.It is possible the note refers to a review of these records, but there is no evidence establishing that fact (if it is a fact). These records contain numerous references to Nur having "a seizure disorder," "a history of seizures," and having taken prescription seizure medication in the past. Yet there is no testimony or other evidence, such as a notation in an actual patient chart or medical record, that documents or explains these records were in fact reviewed,[22] let alone how that review informed a medical determination that seizure medication was not warranted.[23] Nor is there any evidence that either Nurse Schneider-Loberg or NP Essien consulted with the physician who oversees the care provided to the detainees. *Id.* at 21-22.

Thus, the Court is left with the argument—as articulated by Defendants' counsel at the hearing—that Essien and Schneider-Loberg made a determination not to give Nur medication and therefore there can be no deliberate indifference. But the mere fact that medical providers decided to withhold medication cannot insulate them from liability for deliberate indifference to a detainee's serious medical needs. If that were sufficient, no provider would ever be liable for deliberate indifference. After all, whenever a provider withholds care it necessarily means she made a determination not to provide it.

---

[22] The medical records include other "Medical Verification" and "Medical Provider Medication/Chart/Record Review" documents but no such record regarding verification of Nur's Dilantin prescription during the period from May through October 15, 2017. *See* Dkt. No. 62 at 80, 98, 99, 124.

[23] Once again Defendants rely on "facts" that mischaracterize the record, asserting that Nur had been without medication and seizure-free for a significant period of time and that Mayo only gave him Dilantin "out of an abundance of caution" and not because he actually needed it.

Defendants also offer the Rule 30(b)(6) testimony of PA Ross to establish they were not deliberately indifferent. Ross was not at Olmsted County ADC at the time of these events. *Id. at* 3. She therefore cannot testify as to Defendants' subjective state of mind. Nor can she testify as to the basis for their decision making.[24] Her testimony is nothing more than an after-the-fact opinion that Defendants made a sound medical judgment. As such, her testimony is not a *factual* basis for granting summary judgment.

Moreover, she testified that whether to put someone on anti-seizure medication, even a person whose seizures were not spontaneous, "would really depend on the circumstances with that patient. What the triggers are. What medications they . . . were looking for." *Id.* at 21. As to Nur specifically, she testified that knowing his seizures were spontaneous "would have been an important factor" but "it wasn't clear that they were spontaneous." *Id.* at 22. She added that anti-seizure medication is prescribed when "the benefits of the medication outweigh the risks of the medication," which "really depends on the patient." *Id.* at 25. It is undisputed that Defendants did not undertake any part of this analysis. Given it is undisputed that Nur claimed to need seizure medication, that his body was telling him he needed it [Dkt. No. 62 at 64], *i.e.,* that a seizure may be coming on[25]; and that his medical records clearly established a history of seizures and of taking

---

[24] Though PA Ross also testified as to her "interpretation" of what was said during the call with "Shelly" at Dakota County, she was not on the call, did not speak to any participants in the call, and her interpretation is self-serving and incompetent as evidence.

[25] Ross agreed that when a person says his body is telling him he needs his medication, he means he feels as though a seizure may be coming on. *See* Ross Dep. Tr. 23-24 ("Q: And in that request he said his body is telling him that he's having symptoms of another seizure coming on. Right?" A: That - yes, that's my understanding. He says my body is telling me I need it through symptoms I'm feeling."), Dkt. No. 61-1. However, Ross questioned his statement because he did not suffer a documented seizure at the time he sent that email asking for his medication and because "typically" seizures "come out of the blue and so there's really no warning sign." *Id.*

prescription medication, the failure to undertake this analysis is itself evidence of disregard.

Defendants also fault Nur for not discussing his "symptoms" with medical personnel when they suggested he might do so ["[i]f you would like"] in their reply to Nur's September 27 email asking (again) for his seizure medication because his body was telling him he needed it. Dkt. No. 62 at 64. But it is not clear what difference it would have made given (1) that Defendants had already repeatedly denied his requests for his seizure medication; (2) that Defendants assert there is no such thing as having a symptom of an impending seizure. *See* Def. Br. 4 ("Plaintiff suggested he could feel a need for the medication through the 'symptoms [he was] feeling.' (*Id.)* It is uncommon for a person that experiences spontaneous seizures to have any sense that a seizure may be coming."), Dkt. No. 60; and (3) that their September 29 reply telling Nur that medical personnel could "possibly address those [symptoms] [spe]cifically" also states unequivocally that they were still denying him his seizure medication. Dkt. No. 62 at 64. There is no suggestion in their reply email that their offer to "possibly address" his symptoms directly would include actually prescribing his medication.

In short, the record in this case establishes that Nur informed Defendants he had a seizure disorder and needed his anti-seizure medication. Defendants claim to have investigated the request and made an informed medical decision not to provide treatment. But the record establishes only that a nurse called the Dakota County Jail, who informed her that Nur did not have medication during the five days he was at their facility, though he had had it in the past. There is no evidence that any further investigation was undertaken. There is no evidence that either Nurse Schneider-Loberg or NP Essien

actually reviewed Nur's medical records or, if they did, what exact records they reviewed. There is no evidence either Defendant discussed Nur's medical situation with a doctor. There is no evidence why in fact they decided not to give Nur his medication. Based on this record, a reasonable jury could find in Nur's favor.

A couple of final observations are in order. First, Defendants point out it is not surprising NP Essien has no recall of her conversation with Nurse Schneider-Loberg. That is true. But the real problem for Defendants is not Essien's lack of memory but the utterly inadequate nature of the contemporaneous documentation in Nur's medical chart.[26] Defendants cannot correct this deficiency in the contemporaneous record by "interpreting" the notes in a manner that is both self-serving and unsupported.

Finally, Defendants argue that summary judgment must be granted because Nur has failed to particularize to each Defendant the conduct he alleges violated his constitutional rights. The Court disagrees. "To prevail on a § 1983 claim, a plaintiff must show each individual defendant's personal involvement in the alleged violation." *White v. Jackson,* 865 F.3d 1064, 1081 (8th Cir. 2017). The record is clear that Schneider-Loberg and Essien were personally involved in Nur's medical care and, specifically, the failure to provide him with his seizure medication despite his repeated requests for it. *See, e.g.,* Dkt. No. 62 at 64, 66, 68, 78, 91. Defendants argue that because Nurse Schneider-Loberg "is not in charge of prescribing medication" she cannot be liable for failing to prescribe it. *See* Def. Reply Br. 8, Dkt. No. 68. But again they cite to nothing in the record that establishes the scope of her authority, including with respect to medication, or what she

---

[26] It is a charitable description to label the handwritten notes of Schneider-Loberg's calls "chart notes."

was or was not "in charge of." The record shows that Essien and Schneider-Loberg knew Nur asked for his seizure medication and participated in responding to his requests. It supports an inference that their response was constitutionally inadequate because, though they dispute it, they failed to investigate his requests for his medication beyond an initial phone call asking whether Nur had seizure medication during the five days he spent at the Dakota County Jail to make a court appearance.

In sum, Defendants have failed to satisfy their initial burden of demonstrating the absence of a genuine dispute of material fact. Based on the record before the Court a reasonable jury could find that Defendants were deliberately indifferent to Nur's serious medical needs.

### D. Causation

Finally, Defendants argue that Nur has not established any harm proximately caused from the refusal to give him his anti-seizure medication. Nur argued that every day without such medication causes fear that he will suffer a seizure without it, and such fear is a cognizable damage. Mtn. Hrg. Tr. 36-37, Dkt. No. 72. As the record makes clear, Nur repeatedly asked for his medication, and he unequivocally stated he felt he was going to have a seizure. It is a reasonable inference for the trier of fact that Nur suffered emotional distress and anxiety resulting from Defendants' refusal to provide his seizure medication. "[M]ental and emotional distress, which include mental suffering and emotional anguish, constitute compensable injury under § 1983." *Coleman,* 114 F.3d at

786. This alone is enough to raise a fact question of causal harm resulting from the alleged constitutional violation.[27]

## CONCLUSION

The Court acknowledges that the state of the record in this case is such that neither side has established a right to judgment as a matter of law. But Rule 56 requires the moving parties to put forth evidence to establish there is no genuine dispute of material fact and they are entitled to judgment as a matter of law. On the record before the Court, which consists almost entirely of contemporaneous documentary evidence, the case is replete with genuine disputes of highly material facts. The case should proceed to trial on Nur's claim of deliberate indifference.

## RECOMMENDATION

For the reasons set forth above, the Court RECOMMENDS that:

1.      Defendants Stella Essien, Elizabeth Schneider-Loberg and MEnD Correctional Care, PLLC's Motion for Summary Judgment [Dkt. No. 58] be GRANTED IN PART and DENIED IN PART as follows:

a.      Plaintiff's Eighth Amendment cause of action be dismissed;

b.      The motion be granted with respect to MEnD Correctional Care, PLLC because any *Monell* claims fail as a matter of law;

c.      Any purported official capacity claims against Essien and Schneider-Loberg be dismissed because any *Monell* claims fail as a matter of law; and

---

[27] Whether being off his seizure medication caused or contributed to Nur's post-tasing seizure is a separate causation issue which Nur contends is an issue for trial. Mtn. Hrg. Tr. 39, Dkt. No. 72. Nur offered no such specific evidence in the present summary judgment proceedings.

      d.     The motion be denied with respect to Plaintiff's Fourteenth Amendment deliberate indifference claims against Essien and Schneider-Loberg.

      2.     Defendant Olmsted County's Motion for Summary Judgment [Dkt. No. 65] be GRANTED.

Dated: August 26, 2021               s/ David T. Schultz
                                     DAVID T. SCHULTZ
                                       U.S. Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).